1

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Shekhar Suresh Patil          Plaintiff,

vs.

Case No. 12-1052 JRT/JSM
(To be assigned by Clerk of District Court)

Minnesota State University, Mankato

and

Inter Faculty Organization

DEMAND FOR JURY TRIAL

YES ☐      NO ☐

Defendants.

## COMPLAINT

PARTIES

1. Name, address and telephone number

   a. Plaintiff

   Shekhar Suresh Patil

   327 Blue Earth Street

   Blue Earth County, Mankato

   Minnesota  56001

   (507) 469 5426



2. a. Defendant No. 1

   Minnesota State University, Mankato

   309 Wigley Administration Building, W South Road

   Blue Earth County, Mankato

   Minnesota 56001

   (507) 389 1111

   b. Defendant No. 2

   Inter Faculty Organization

   490 Concordia Avenue, Suite 125

   Ramsey County, St. Paul

   Minnesota 55103

   (651) 227 8442

3. What is the basis for federal court jurisdiction?

   ☐ Federal Question    ☐ Diversity of Citizenship

4. If the basis for jurisdiction is Federal Question, which Federal Constitutional, statutory or treaty right is at issue?

   28 U.S.C. 1331;

   18 USC 1001 Subsection (a) and (c);

   18 USC 1512 Subsection (b) (2) (A) and (c) (1);

   29 USC 501 Subsection (b);

   29 USC 185 Subsection (a), (b) and (c);

   5 USC 7114 Subsection (a) (1), (2), (5) (B) and (b) (3), (4) (B).

5. Not Applicable

6. What is the basis for venue in the District of Minnesota?

☐ Defendants reside in Minnesota      ☐ Facts alleged below primarily occurred in Minnesota

STATEMENT OF THE CLAIM

7. Plaintiff alleges that Defendant No. 1 knowingly and willfully concealed material facts and made materially false statements a Position Statement (Exhibit 1) to a Federal Investigator of the Equal Employment Opportunity Commission (EEOC), damaging the Plaintiff's employment record, even after the Plaintiff submitted relevant facts to the President of Defendant No. 1 in a formal letter dated September 15, 2011 (Exhibit 2), leading the EEOC to issue a Notice of Right to Sue Defendant No. 1 (Exhibit 3). The grievance officer of Defendant No. 2 commented (Exhibit 4) on a draft of the September 15, 2011 letter and submitted to the President of Defendant No. 1 in a meeting on September 30, 2011 that the recommendation for the Plaintiff's non-renewal was "biased and misinformed." The recommendations for the Plaintiff's non-renewal knowingly and willfully concealed material facts including facts from the Plaintiff's 2010-2011 Professional Development Report (Exhibit 5), which the Plaintiff was told he would have an opportunity to discuss with the Plaintiff's supervisor (Exhibit 6; three separate communications) in "early fall 2011." The Plaintiff was not given the opportunity to discuss the 2010-2011 Professional Development Report with the supervisor, and the supervisor falsely suggested in his June 16, 2011 memorandum (Exhibit 7), written during the summer break, that he had met with the Plaintiff to discuss the Plaintiff's Professional Development Report.

4

8. In the fifth paragraph on Page 2 of the Position Statement submitted by Defendant No. 1 to the EEOC (Exhibit 1 referred to in paragraph 7) Defendant No. 1 claims that the Plaintiff's "failure with the second criterion, scholarly research, was similarly clear." First, the "industrial client" referred to in this paragraph of the Position Statement happens to be Minnesota Department of Transportation, with whom the Plaintiff has worked on various assignments since 2007 when the Plaintiff was a Faculty Research Associate at the University of Colorado at Boulder, most recently as a Construction Management faculty at Defendant No. 1 for a panel discussion at the Transportation Asset Management Conference in San Diego in April 2012. On January 24, 2012 the Plaintiff met with an official at the Government Accountability Office in Washington DC, wherein the GAO official confirmed that the policy guidance that the Plaintiff helped the Minnesota Department of Transportation develop in 2008 was consistent with federal guidelines. The egregious claim about the "industrial client" by Defendant No. 1 demonstrates the failure of Defendant No. 1 to exercise due Standard of Care when offering advice to and commenting on the work of government agencies, about which the Plaintiff complained to the Ombudsman at the Minnesota Department of Transportation after the Plaintiff became aware of Defendant No. 1's unwillingness to reason. Second, as a faculty member at Defendant No. 1 the Plaintiff's scholarly research was published in the following prestigious international conferences and journals: Built Environment Conference in South Africa, Journal of Construction Engineering and Management (two separate papers), Journal of Public Procurement, and the International Journal of Engineering Management and Economics. Defendant No. 1 even announced two of the Plaintiff's scholarly publications in a "Good News" newsletter published monthly by the Plaintiff's College. While Defendant No. 1 was moving ahead with the the Plaintiff's dismissal during the 2011 summer break although "Faculty members are generally absent from campus during the summer

5

as they are typically not on duty until about mid August when the new academic year begins," as acknowledged in paragraph 4 on page 1 of the Position Statement to the EEOC by Defendant No. 2 (Exhibit 8), the Plaintiff was personally requested by a senior professor of Construction Management at the University of Technology in Australia—on a handwritten note—to write a review of a recent book the professor had edited and sent a copy of the book to the Plaintiff. This book was touted as the standard for Construction Management at the June 2011 Business Meeting of the International Council for Research and Innovation in Building and Construction, where Defendant No. 1 had sent the Plaintiff. Although Defendant No. 1 may not be aware of Plaintiff's communication with the professor in Australia, the Plaintiff's record of scholarly work (Exhibit 9) demonstrates that Defendant No. 1's claim about Plaintiff failure in scholarly research constitutes knowingly and willfully concealing material facts and making materially false statements to a Federal Investigator. Defendant No. 2 decided to toe the line and concealed material facts uncovered by the grievance officer, leading the EEOC to issue a Notice of Right to Sue Defendant No. 2 (Exhibit 10).

9. The Director of Grievances and Equity (the Director) for Defendant No. 2 forced the grievance officer of Defendant No. 2's Faculty Association at Defendant No. 1 to change the grievance officer's finding, nearly nine months after the Plaintiff (i) had expressed grievance at the Faculty Association General Meeting on January 6, 2011 about the threat of dismissal, (ii) was asked to become a full member of Defendant No. 2 in order for Defendant No. 2 to help the Plaintiff, and (iii) had been asked to write and sign a letter in January 2011 authorizing the grievance officer to "speak to anyone and access any and all records" pertaining to the Plaintiff's complaint (Exhibit 11), culminating in the grievance officer's observation in September 2011 that the

recommendation for Plaintiff's non-renewal was "biased and misinformed." (Exhibit 4, referred to in paragraph 7) In the Position Statement submitted by Defendant No. 2 the Director of Grievances and Equity lied to the EEOC (Exhibit 8, referred to in paragraph 8) that the Plaintiff contacted the grievance officer "between August 15 and 18, 2011" when in fact the Plaintiff had had a number of meetings and communications with the grievance officer between January 2011 and September 2011 and was taken to the Faculty Association office and enrolled as a full member of Defendant No. 2 in January 2011 so that the grievance officer could look into the concerns aired by the Plaintiff at the January 6, 2011 General Meeting. It is therefore evident that Defendant No. 2 knowingly and willfully concealed material facts and made materially false statements to a Federal Investigator.

10. Defendant No. 2 willfully endorsed the lies by Defendant No. 1 to terminate the Plaintiff's employment, about which the Plaintiff complained in a letter to a member of the Board of Directors of Defendant No. 2 (Exhibit 12).

11. In the fall of 2010 the Plaintiff had been referred to an Academic Affairs officer at Defendant No. 2, Professor Donna Brauer, who observed in an e-mail dated November 25, 2011 (Exhibit 13) referring to conversations with the Plaintiff a year ago, that the Plaintiff's supervisor and department chair were violating the Plaintiff's contract—a collective bargaining agreement negotiated by Defendant No. 2 with Minnesota State Colleges and Universities. The violation of contract relates to the Plaintiff's message to the President of Defendant No. 1 on December 13, 2010 (Exhibit 14) about the need to focus the evaluation of teaching and learning at Defendant No. 1 on student learning, based on the Plaintiff's communication with the Director of the Center

CASE 0:12-cv-01052-JRT-JSM   Doc. 1   Filed 04/27/12   Page 7 of 11

7

for Teaching and Learning, an institutional research specialist within Academic Affairs at Defendant No. 1, and the Academic Affairs officer at Defendant No. 2. Instead of directing university officials to evaluate the facts even after the Plaintiff made a request to that effect to the Office of the President of Defendant No. 1 on September 1, 2011, the President of Defendant No. 1 decided to endorse the decision to terminate the Plaintiff's employment based on false claims in spite of Plaintiff's efforts to improve teaching and learning consistent with the contract as well as Minnesota Higher Education Statutes 135A.011 and 136A.27. Key testimonials in this regard are as follows:

12. The former Director of the Center for Excellence in Teaching and Learning (CETL) at Defendant No. 1 informed the Plaintiff that no one knew when the standard forms for student evaluation were developed or who developed them, their use leads to "apples to oranges" comparisons, and improving student learning was not even an objective set for his Center. In the Position Statement submitted to the EEOC Defendant No. 1 refused to acknowledge that the Plaintiff's work with regard to assessing student learning exceeded the prevailing standards at Defendant No. 1.

13. An Institutional Research Specialist representing the office that processes the standard forms opined in an e-mail communication that the form that the Plaintiff had developed, included in the Plaintiff's Professional Development Report and used by the Plaintiff for student evaluations "effectively eliminated the questions that have little relational value with how/what students are learning. Which ultimately seems to be a defining feature of a university." (Exhibit 15)

14. The Director of the Center for Faculty Development for the Minnesota State Colleges and Universities opined that the Plaintiff's efforts to evaluate teaching and learning were

"miles ahead" of what others were doing. In an e-mail message the Director wrote that the Plaintiff is clearly a "kindred spirit with respect to teaching and learning." (Exhibit 16)

15. A Professor and an Academic Affairs officer at Defendant No. 2 stated the following in an e-mail message dated 11-25-2011 (Exhibit 13, referred to in paragraph 11) marked "High" priority, copied to the President and the grievance officer of the Faculty Association: "If your department colleagues or your dean are mandating a particular form, they are violating the IFO contract."

16. The chair of Construction Management department who initiated the non-renewal recommendation was informed (Exhibit 17) about the Plaintiff's use of student evaluation forms that actually measured specific learning outcomes, who informed the Plaintiff that this is exactly where the department's accreditation agency expected programs to go, as was already being done in the programs at other universities where the Plaintiff worked prior to Defendant No. 1. Subsequently the Plaintiff relayed the communication to colleagues in the department including the chair (Exhibit 18).

17. In the second-to-last paragraph on Page 2 of the Position Statement submitted by Defendant No. 1 to the EEOC, Defendant No. 1 claims that the Plaintiff's "interaction with students is best characterized as conflict and confusion." This spurious claim can only be addressed by looking into the remarks from time to time of the one person best qualified to comment on faculty-student interactions in the Plaintiff's Department and College—the Student Relations Coordinator for the College of Science, Engineering and Technology at Defendant No. 1 (Exhibit 19). The Student Relations Coordinator wrote to the Plaintiff from time to time praising the feedback from the students about the Plaintiff's interaction with students, wherein the Plaintiff demonstrates high

expectations and the pursuit of excellence individually as well as collaboratively. The "conflict and confusion in student interactions" alleged by Defendant No. 1 refers to an advising tool developed by the Plaintiff in consultation with colleagues and the Student Relations Coordinator. The Plaintiff's efforts were consistent with the university President's appeal to the faculty at the August 2011 convocation to do everything possible to reduce student indebtedness and ensure timely graduation. Plaintiff's advisees have in fact welcomed the tool and some have even said they wished someone had worked with them on a similar tool when they started their college education. Defendant No. 1's allegation refers to a blank 1-page spreadsheet, included in the Plaintiff's September 15, 2011 letter to the President of Defendant No. 1 (Exhibit 2, referred to in paragraph 7). The Plaintiff uses the simple spreadsheet to help students prepare their plan for completing the coursework required for graduation, each time citing President Dwight Eisenhower's highly relevant remarks for construction managers, that plans are often useless but planning is indispensable.

18. In the second-to-last paragraph on Page 2 of the Position Statement submitted by Defendant No. 1 to the EEOC (Exhibit 1 referred to in paragraph 7), Defendant No. 1 claims that the Plaintiff was "removed from a university-wide curriculum committee..." The Chair of the committee had remarked in an e-mail that the Plaintiff's department needed a "better apprenticeship process" before assigning new faculty to the university-wide curriculum committee, because the Plaintiff had been employed by Defendant No. 1 for only two months and was seeking to understand the logic of the Curriculum Development System at Defendant No. 1. Several weeks later when the Plaintiff sought to discuss this issue with the supervisor in an Open Discussion forum to which the Plaintiff was invited, it became evident that the supervisor's office

10

was not aware of any removal decision. (Exhibit 20)

19. At the advice of an attorney and after a discussion with a representative of the Minnesota Department of Human Rights the Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) on December 9, 2011 (EEOC Charge No. 444-2012-00155 and EEOC Charge No. 444-2012-00196). On 03-29-2012 the EEOC issued the Plaintiff Notices of the Right to Sue Defendant No. 1 and Defendant No. 2 within 90 days, based on the Plaintiff's response to the Position Statements submitted by Defendant No. 1 and Defendant No. 2 to the EEOC. (Exhibit 21)

20. Internal department e-mail communications dated April 20, 2011 and November 9, 2011 (Exhibits 17 and 18 referred to in paragraph 16) as well as an e-mail chain (Exhibit 15 referred to in paragraph 13) starting with the President of Defendant No. 1, the Plaintiff sought to focus the evaluation of teaching and learning on meaningful techniques and assessment, based on communication in that regard with pertinent officials at Defendant No. 1.

21. The Human Resources Director at Defendant No. 1 informed the Plaintiff of the last date of his employment as May 7, 2012 in a letter dated February 24, 2012 (Exhibit 22) even though Defendant No. 1's Position Statement to the EEOC stated the last date of Plaintiff's employment as July 1, 2012. Plaintiff responded to the Human Resources Director at Defendant No. 1 complaining about the lies that Human Resources relied on, in a letter dated February 27, 2012 (Exhibit 23), requesting a proper and reasonable action by Defendant No. 1.

22. Plaintiff's contract conditions relating to performance evaluation (Exhibit 24), the Position Statements submitted by Defendant No. 1 (Exhibit 1 referred to in paragraph 7) and by Defendant No. 2 (Exhibit 8 referred to in paragraph 8) to the EEOC, the response of Defendant No. 1 to an ethics complaint the Plaintiff submitted to Defendant No. 1 with a copy to the President of Defendant No. 2 (Exhibit 25), and other aforementioned evidence attest to the violations of statutes mentioned in paragraph 4 by Defendant No. 1 and Defendant No. 2.

REQUEST FOR RELIEF

The Plaintiff respectfully requests the honorable Judge to recognize the violations alleged in paragraph 22 and void the contractually untenable decision by Defendant No. 1 to terminate the Plaintiff's employment and restore the Plaintiff's rights under the contract, and

The Plaintiff respectfully requests the honorable Judge to recover from Defendant No. 2 all membership dues paid, court fees, and expenses related to this lawsuit, for breach of fiduciary responsibility, breach of contract, and the breach of duty of fair representation, and

The Plaintiff respectfully requests the honorable Judge to grant all additional relief to which the plaintiff is entitled.

Signed this 27th day of April 2012.

Signature of Plaintiff _____

Mailing Address

327 Blue Earth Street

Mankato, MN 56001

E-mail address Shekhar.S.Patil@Gmail.com

Telephone Number (507) 469 5426