UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SHEKHAR SURESH PATIL,                          CIV. NO. 12-1052 (JRT/JSM)

     Plaintiff,                          REPORT AND RECOMMENDATION

v.

MINNESOTA STATE UNIVERITY, MANKATO,
INTER FACULTY ORGANIZATION,

     Defendants.

This matter is before the Court on defendant Inter Faculty Organization's Motion to Dismiss Under Rule 12(b)(6) for Failure to State a Claim [Docket No. 5] and Motion to Dismiss [Docket No. 28][1], Defendant Minnesota State University, Mankato's Motion to Dismiss Complaint [Docket No. 16], and Plaintiff's Motion for Default Judgment [Docket No. 19]. These matters were referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) [Docket Nos. 7, 22, 36].

## I.     BACKGROUND

Plaintiff Shekhar Suresh Patil, who is pro se, sued his former employer, Minnesota State University, Mankato ("MSUM") and the Inter Faculty Organization ("IFO"), the exclusive bargaining representative for the faculty of the Minnesota State Universities system. Defendant IFO's Memorandum in Support of Motion to Dismiss, p. 1 ("IFO Mem.") [Docket No. 30].

---

[1]     These two motions were the same and the Inter Faculty Organization submitted a single memorandum in support of the two motions.

Patil was hired as a probationary, tenure-track faculty member in the Department of Construction Management in the College of Science, Engineering and Technology at MSUM for the 2010-2011 academic year. Complaint, Ex. 5, p. 1 (Patil's Professional Development Report for the 2010-2011 academic year); Ex. 8 (IFO's position statement to the EEOC) [Docket No. 1-3]. In January, 2011, Patil wrote to Mary Visser, Vice-President of the MSUM Faculty Association and Chief Grievance Officer of the IFO. Complaint, Exs. 2, p. 1 (letter to MSUM President Richard Davenport from Patil dated September 15, 2011, recounting Patil's interactions with Visser),11, p. 2 (letter from Patil to Visser dated January 19, 2011). Patil reported that he had met with Dean John Knox and Dean Knox informed him about the possible non-renewal of Patil's contract at the recommendation of Patil's senior colleagues. Id., Ex. 11, p.2.

On July 25, 2011, Dean Knox and Interim Academic Affairs Vice President Anne Blackhurst recommended that Patil's appointment not be renewed. Complaint, Ex. 2, p. 1. Probationary faculty at MSUM are evaluated for renewal based on five criteria described in the collective bargaining agreement ("CBA") between the Minnesota State Colleges and Universities System ("MSCU") and the IFO. Complaint, Ex. 1 (MSUM's Position Statement to the EEOC). These criteria are: (1) demonstrated ability to teach effectively and/or perform effectively in other current assignments; (2) scholarly or creative achievement or research; (3) evidence of continuing preparation and study; (4) contribution to student growth and development; (5) service to the university and community. Id. According to MSUM, Patil failed to provide any teaching evaluations, which is an automatic failure to meet the criterion. Complaint, Ex. 1, p. 3. MSUM also asserted that Patil failed the second criteria because his collaborations with an industrial

client were "fraught with conflict" and placed future collaborations with the client in jeopardy. Id. As to the fourth criteria, MSUM believed that his interactions with students "[was] best characterized as conflict and confusion." Id. Regarding the fifth criteria, MSUM noted that Patil was removed from a University-wide curriculum committee because his "conduct alienated both students and professors." Id.

Visser met with the MSUM Provost on Patil's behalf and advocated that Patil be allowed to serve an additional year in his probationary appointment to correct performance deficiencies that had been identified in Dean Knox and Vice President Blackhurst's letters. Complaint, Ex. 8, p. 2. Visser was unsuccessful in persuading the Provost that Patil should be allowed an additional year. Id., p. 3. Visser also assisted Patil in drafting a statement in preparation for a meeting he had scheduled with MSUM President Richard Davenport. Id. Visser prepared "talking points" for Patil to use in his meeting with President Davenport. Id.

Article 25, Section D of the Collective Bargaining Agreement ("CBA") between the Minnesota State Colleges and Universities and the IFO requires that faculty members whose appointments are not being renewed at the end of their first year be informed no later than November 1 of the following academic year. Affidavit of Connie Howard ("Howard Aff."), Ex. 1 (excerpts of the CBA) [Docket No. 31]. On or about October 28, 2011, Patil reported to Visser that he had received President Davenport's decision not to renew his appointment. Complaint, Ex. 8, p. 2. President Davenport concurred that Patil had not made sufficient progress in the five areas to warrant renewal. Complaint, Ex. 1, p. 2.

Following President Davenport's decision, Visser consulted with the IFO's President James Grabowksa and Director of Grievances and Equity, Patrice Arseneault, to determine if there were any facts that would support a grievance. Complaint, Ex. 8, p. 3. Visser and Arseneault determined that Patil did not have grounds for a grievance "because the employer had not violated the contractual procedure for issuing a non-renewal decision and the non-renewal decision was based on the employer's evaluation that Dr. Patil's performance was deficient in four areas." Id.

Patil filed charges with the United States Equal Employment Opportunity Commission ("EEOC") against the IFO and MSUM alleging that he had been subjected to discrimination by both on the basis of age, race and in retaliation for engaging in a protected activity. Complaint, Ex. 21 (Patil's response to position statements of MSUM and IFO to the EEOC); Ex. 1 (MSUM's response to Patil's EEOC charge). MSUM responded that it had a legitimate, non-discriminatory basis for not renewing Patil's appointment (i.e. his failure to make progress on the five criteria contained in the CBA) and indicated that Patil failed to identify any protected conduct that could form the basis of a claim for retaliation. Complaint, Ex. 1. The IFO stated that it believed that MSUM followed the correct procedural process in connection with its decision not to renew Patil's appointment. Complaint, Ex. 8, p. 3 (IFO's response to Patil's EEOC charge). Further, the IFO contended that MSUM's decision was not arbitrary or capricious because the recommendations cited deficiencies in the areas in which probationary faculty are evaluated. Id.

Patil responded to these statements, outlining his belief that age and race discrimination may have played a role in MSUM's decision not to renew his contract. Complaint, Ex. 21.

The EEOC investigated Patil's charges and on March 29, 2012, issued a determination that it could not conclude that a violation of the statutes enforced by the EEOC had occurred. Complaint, Ex. 3 (letter from EEOC investigator to Patil). The EEOC dismissed Patil's charge and issued a Notice of Suit Rights. Id., p. 2 (Dismissal and Notice of Rights).

Patil then sued the IFO and MSUM alleging violations of federal and state law. Patil alleged that MSUM concealed material facts and made materially false statements to the EEOC investigator in violation of these laws and that MSUM's actions damaged his employment record. Complaint, ¶7. Further, Patil claimed that the recommendations not to renew his appointment "knowingly and willfully concealed material facts" that he believed would have favorably influenced decision-makers regarding his appointment. Id.

The balance of the Complaint alleged various reasons why MSUM improperly evaluated Patil under the performance evaluation criteria. Complaint, ¶¶8-11. For example, Patil challenged MSUM's determination that his scholarly research was deficient by submitting specific examples of scholarly articles he had written and describing the publications in which they had been published. Id., ¶8.

Patil further alleged that the IFO's Director of Grievances and Equity "forced the grievance officer of [MSUM] to change the grievance officer's finding" although the

factual basis for this allegation is not altogether clear.[2] Id., ¶9. According to Patil, the IFO lied to the EEOC when it stated in its position letter that Patil had contacted Visser sometime between August 15 and 18, 2011, to advise her that he had received a recommendation for non-renewal. Id. (citing Exhibit 8) (IFO's response to Patil's EEOC charge). In fact, Patil had met with the grievance officer a number of times between January, 2011 and September, 2011. Id. As a result, Patil contended that the IFO "knowingly and willfully concealed material facts and made materially false statements to a Federal Investigator," and "willfully endorsed" MSUM's "lies" to terminate Patil's employment. Id.

Patil also alleged that in the fall of 2010, he received an email from Donna Brauer, a professor in MSUM's School of Nursing and an Academic Affairs officer for MSUM. Id., ¶11, Ex. 13 (email from Brauer to Patil dated November 25, 2010). Brauer wrote to Patil that if his department colleagues or the Dean of his college were demanding that he use any particular form for student evaluations of his teaching, that demand was a violation of the IFO contract, which does not require that any particular teaching evaluation form be used. Id. Patil had written to President Davenport in December, 2010, suggesting that an alternative method of teaching evaluation be implemented to replace the forms currently in use, which Patil believed were inadequate. Id.; Ex. 14 (email from Patil to President Davenport dated December 13, 2010). Patil believed that the decision not to renew his appointment was based on false claims, apparently about the lack of teaching evaluations he had garnered, when, in

---

[2]     This allegation appears to be based on Patil's belief that the grievance officer observed that the non-renewal decision was "biased and misinformed," but the IFO's position statement does not contain that language.

fact, he had attempted to "improve teaching and learning consistent with the contract. . . ." Id., ¶11.

Patil also challenged MSUM's description of his interactions with students as characterized by "conflict and confusion." Id., ¶17. Patil alleged that he had received favorable feedback on his interactions with students from the Student Relations Coordinator of MSUM's College of Science, Engineering and Technology, where Patil taught. Id.; Complaint, Ex. 19 (email exchanges between Patil and Angie Bomier, Student Relations Coordinator). In addition, while not denying that he had been removed from a university-wide curriculum committee, Patil claimed that whatever issues there were with his involvement in this committee, his department was to blame for assigning him to it when he had only been employed at MSUM for two months. Id., ¶18.

The Complaint further alleged that MSUM lied to the EEOC when it stated that Patil's last day of employment would July 1, 2012, when, in fact, he had been informed that his last day of work would be May 7, 2012. Id., ¶21.

Based on these facts, Patil claimed that MSUM and the IFO violated the following federal statutes:

- 18 U.S.C. § 1001(a) and (c), which provides criminal penalties for:

    Whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States who knowingly and willingly—(1) falsifies, conceals, or covers up by any trick, scheme or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."

Subsection (c) makes subsection (a) applicable to:

> (1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or (2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with appliCBAle rules of the House or Senate.

- 18 U.S.C. § 1512(b)(2)(A), which provides a criminal penalty for:

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to. . .cause or induce any person to withhold testimony, or withhold a record, document, or other object, from an official proceeding.

- 18 U.S.C. § 1512(c)(1), which provides a criminal penalty for:

> Whoever corruptly alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding.

- 29 U.S.C. §501(b) of the Labor Management Reporting and Disclosure Act ("LMRDA"), which provides:

> When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a)[3] of this section and the labor

---

[3]    29 U.S.C. §501(a) describes the duties of officers of labor organizations as follows:

> The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage,

organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation.

- 29 U.S.C. § 185(a), (b) and (c), which describe how suits against labor organizations may be brought pursuant to the Labor Management Relations Act, 1947 ["LMRA"]

- 5 U.S.C. § 7114(a)(1) and (2) which provide:

  (a)(1) A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all

---

invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

employees in the unit. An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.

(2) An exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at—

> (A) any formal discussion between one or more representatives of the agency and one or more employees in the unit or their representatives concerning any grievance or any personnel policy or practices or other general condition of employment; or

> (B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if—

>> (i) the employee reasonably believes that the examination may result in disciplinary action against the employee; and

>> (ii) the employee requests representation.

- 5 U.S.C. § 7114(a)(5)(B) and (b)(3), which provide:

> (a)(5) The rights of an exclusive representative under the provisions of this subsection shall not be construed to preclude an employee from. . .

>> (B) exercising grievance or appellate rights established by law, rule, or regulation; except in cases of grievance or appeal procedures negotiated under this chapter.

> (b) The duty of an agency and an exclusive representative to negotiate in good faith under subsection (a) of this section shall include the obligation—
>> * * *
>> (3) to meet at reasonable times and convenient places as frequently as may be necessary, and to avoid unnecessary delays[.]

- 5 U.S.C. § 7114(b)(4)(B), which describes the duties of an agency and an exclusive representative to negotiate in good faith under subsection (a) to include:

> (4) in the case of an agency, to furnish to the exclusive representative involved, or its authorized representative, upon request and, to the extent not prohibited by law, data—
>
> \*\*\*
>
> > (B) which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining;

Complaint, ¶4 [Docket No. 1].

Patil also asserted state claims of breach of contract against MSUM, and breach of fiduciary responsibility, breach of contract and breach of the duty of fair representation against the IFO. Complaint, Request for Relief.

As relief, Patil sought an order "voiding the contractually untenable decision" by MSUM to terminate his employment, and allowing him to recover from the IFO "all membership dues paid, court fees and expenses related to this lawsuit" for its breach of fiduciary responsibility, breach of contract and breach of its duty of fair representation. Id.

### A. IFO's Motion to Dismiss and Patil's Response

In lieu of answering, the IFO moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims based on 18 U.S.C §§ 1001 and 1512 and 29 U.S.C § 501, and to dismiss Patil's state law claims for breach of contract and the duty of fair representation.[4] The IFO also moved for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction over claims based on 5 U.S.C § 7114, 29 U.S.C § 185 and 29 U.S.C § 501.

---

[4] The IFO did not mention Patil's claim for breach of fiduciary duty in its motion to dismiss.

The IFO argued that Patil's claims under 18 U.S.C §§ 1001 and 1512 failed to state a claim on which relief could be granted because the Complaint is utterly devoid of facts to support his claim that the IFO violated these statutes. In response to Patil's allegation that the grievance officer's statement that the non-renewal decision was "biased and uninformed," the IFO pointed to language that was contained in a memo from Visser to Patil making editorial suggestions for a letter <u>Patil</u> drafted to send to President Davenport, and consequently, the language was not a "statement" by the IFO. IFO Mem., p. 10. The only other "false" statement alleged to have been made to the EEOC by the IFO was that "Dr. Patil contacted Dr. Visser during the first week of the 2011-2012 academic year, between August 15 and 18, 2011. . . ." when, as Patil pointed out, he met with the grievance officer between January, 2011 and September, 2011. <u>Id.</u>, p. 11. The IFO noted that its statement was accurate and did not indicate that this was the first time Patil had spoken with Visser about the non-renewal decision. <u>Id.</u> In short, the Complaint did not allege any of the perjurous, corrupt or coercive conduct required to state a claim under these statutes. <u>Id.</u>

More importantly, the IFO submitted that 18 U.S.C §§ 1001 and 1512 are criminal statutes that do not create a private right of action and have never been interpreted to create a private right of action. <u>Id.</u>

As for Patil's claims under 29 U.S.C § 501(b), the IFO noted that § 501(b) creates a private right of action to enforce the responsibilities of officers and employees of labor organizations described in § 501(a), but does not provide a cause of action against the organization itself. <u>Id.</u>, p. 13. In addition, Patil did not undertake any of the procedural prerequisites required by § 501(b). For example, he did not ask the IFO to

sue the representative alleged to have breached his or her duties or obtain leave of the court to bring the suit after showing good cause.  Id.  Finally, the Complaint did not allege any self-dealing by any member of the IFO—an essential element of any claim under        § 501(b).  Id., pp. 13-14 (citing Gaston v. Gilchrist, 614 F.3d 775, 778 (8th Cir. 2010)).

Regarding Patil's claims under 29 U.S.C § 185 and again under 29 U.S.C § 501, the IFO argued that those statutes apply only to employers, employees and labor organizations in the private sector.  Id., p. 14.  In fact, the LMRA and the LMRDA both explicitly exclude "any State or political subdivision thereof" from coverage.  Id., p. 15. Similarly, the IFO contended that any claims against it based on Title VII of the Civil Service Reform Act of 1978, also known as the Federal Service Labor Management Relations Statute ("FSLMRS"), applies only to federal agencies, federal employees and the unions that represent federal employees.  Because MSUM is a subdivision of the State of Minnesota and the IFO represents only Minnesota state employees, the statutes do not apply to Patil's claims.  Id.  In support of its argument that MSUM is a "subdivision" of the state, the IFO relied on the Supreme Court's description of the exemption in NLRB v. The Natural Gas Utility Dist. of Hawkins County, Tenn., 402 U.S. 600, 604-05 (1971):

> [T]he exemption for political subdivisions [applies] to entities that are either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate.

Id.  As proof that MSUM met this description of a political subdivision, the IFO noted that: (1) MSUM was created by an act of the Minnesota Legislature, Minn. Stat. §

136F.10; (2) it is administered by a Board of Trustees appointed by the Governor with the advice and consent of the Minnesota Senate; and (3) the Governor may remove members of the Board of Trustees for cause pursuant to Minn. Stat. § 136F.02, subd. 2 and §15.0575, subd. 4. Id., pp. 15-16.

As for Patil's state law claims, the IFO argued that the claims were time-barred. Id. Although admitting that Minnesota's Public Employee Labor Relations Act ("PERLA") does not contain a statute of limitations for bringing hybrid breach of duty of fair representation and contract claims, the IFO relied on Allen v. Hennepin County, 680 N.W.2d 560 (Minn. Ct. App. 2004), which imported the 90-day statute of limitations described in Minnesota's version of the Uniform Arbitration Act for vacating arbitration awards. Id., p. 17. The IFO argued that Patil knew by November, 2011, that the IFO would not file a grievance on his behalf. Id., p. 18 (citing Complaint, Ex. 21, p. 4, ¶6) (Patil's Position Statement to the EEOC in which he wrote that he spoke with the Associate Vice President of Academic Affairs ). Assuming that Patil's conversation with the Associate Vice President took place on the last day of November, Patil had until February 29, 2012, to file his "hybrid" claim against the IFO, which he did not do. Id. Alternatively, assuming that Patil never received notice of the IFO's decision not to file a complaint, his time to bring his state law claims expired on March 15, 2012.[5]

---

[5] The Court understood the IFO's calculation of this time period to be as follows: the CBA requires that a probationary faculty be notified of non-renewal no later than November 1 of the second academic year of their appointment. There is no dispute that Patil timely received his notice of non-renewal; therefore, he had until December 14, 2011, to file a grievance under the 30-day time frame described by the CBA, which defines "day" to exclude weekends and holidays. IFO Mem., p. 18. As of December 14, 2011, Patil had "at least constructive notice" that the IFO would not be filing a grievance (since they had not done so), triggering the 90-day statute of limitations,

Patil did not respond to any of the IFO's legal arguments. Instead, his response focused on the fact that he was asked to become a full member of the IFO after discussing his possible non-renewal at an IFO meeting and yet the IFO failed to file a grievance on his behalf. Response to Defendant Inter Faculty Organization's Motion to Dismiss, pp. 1-2 [Docket No. 34]. Patil again argued that Visser concluded that the decision to terminate him was "biased and uninformed." Id., p. 1. In other words, Patil's response reiterated the facts described in his Complaint that he believed supported his state law claims against the IFO.

### B.    MSUM's Motion to Dismiss and Patil's Response

MSUM moved to dismiss the Complaint in lieu of answering. MSUM argued that Patil's claims under 18 U.S.C §§ 1001 and 1512 failed because there is no private right of action under those two federal criminal statutes. Memorandum in Support of Defendant MSUM University's Motion to Dismiss Complaint ("MSUM's Mem."), p. 2 [Docket No. 25]. MSUM further contended that Patil's state law claim for breach of contract against MSUM failed because MSUM, as political subdivision of the State, is entitled to Eleventh Amendment Immunity. Id.

Additionally, because Patil was a member of the IFO, MSUM submitted that his exclusive remedy regarding its decision not to renew his contract was to avail himself of the grievance process described in the CBA. Id., p. 4 (citing White v. Winona State Univ., 474 N.W.2d 410, 412 (Minn. Ct. App. 1991) ("the collective bargaining agreement between the IFO/MEA and the State University Board was the sole contract between

---

which would have expired on March 15, 2012. Id. Patil filed this action on April 27, 2012, after the statute of limitations had allegedly expired. Id., p. 19.

the parties. Its grievance procedure provided the exclusive means for resolving grievances between the parties."); Affidavit of Gary R. Cunningham in Support of Defendant MSUM University's Motion to Dismiss Complaint, Ex. 1 (copy of Article 25, Section D, 2009-2011 Contract between IFO and Minnesota State Colleges and Universities) [Docket No. 26-1]. On that basis, MSUM argued that Patil was precluded from bringing a state law claim for breach of contract. Patil did not respond to MSUM's motion to dismiss.

      **C.**     **Patil's Motion for Default Judgment Against MSUM and MSUM's Response.**

On May 29, 2012, Patil filed a Motion for Entry of Default Judgment against MSUM. [Docket No. 19]. Patil believed that because MSUM had not answered the Complaint at the time he filed this motion, he was entitled to default judgment. Patil argued that MSUM's failure to answer "demonstrates that the Defendant made up false reasons to terminate the Plaintiff's employment. As such, the Defendant's actions failed to honor their obligations under the contract." Plaintiff's Memorandum of Law in Support of Motion for Default Judgment ("Pl. Mem. Default"), p. 2 [Docket No. 20].

MSUM responded that Patil did not properly serve MSUM with the Complaint until May 14, 2012.[6] Plaintiff's Request for Entry of Default Judgment, attachment (letter to Gary Cunningham, Esq. from Patil enclosing summons and complaint, letter

---

[6]    Patil attempted to serve MSUM directly rather than the Minnesota State Attorney General, as required by Fed. R. Civ. P. 4(j)(2)(B), which requires service consistent with Minn. R. Civ. P. 4.03(d). See, Pl. Mem. Default, p. 2 (Return of Service indicating that the Blue Earth County Sheriff served the Summons and Complaint on an administrative assistant at MSUM). Minn. R. Civ. P. 4.03(d) requires that service of a complaint against a state or local government must be made on the Attorney General. MSUM's counsel became aware of the suit and wrote to Patil on May 8, 2012, advising him of the proper method of service. MSUM's Response to Request for Entry of Default, Ex. 1 [Docket No. 15-1].

date-stamped as received in the Office of the Minnesota Attorney General on May 14, 2012) [Docket No. 13]. MSUM filed its Motion to Dismiss in lieu of answering on May 31, 2012, within the 21 days prescribed by Fed. R. Civ. P. 12. As a result, when Patil filed his motion, MSUM had not defaulted. Alternatively, to the extent that the Court determined that Patil's attempted service was effective and MSUM was required to file its motion seven days earlier than it did, MSUM argued that Patil was not prejudiced by the delay, and, at any rate, the Complaint against MSUM is meritless and default judgment would be inappropriate. MSUM's Response to Plaintiff's Motion for Default Judgment, pp. 2-3 [Docket No. 33].

### D. Patil's Reference to Constitutional Claims

At the motion hearing, Patil responded to MSUM and the IFO's arguments by reciting Article I, Section 2 of the Minnesota Constitution, which provides that "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers. There shall be neither slavery nor involuntary servitude in the state otherwise than as punishment for a crime of which the party has been convicted." Patil believed that as long as the "judgment of his peers" (i.e. the decision not to renew his appointment, which was made by his "peers" in his department and the MSUM administration) was made based on flawed thinking and "lies," the federal court had jurisdiction over his claims. In other words, Patil believed he was denied the protections of the Minnesota Constitution and was, therefore, entitled to federal constitutional protection. Patil did not elaborate further on this argument.

In response, MSUM protested that Patil had not pled an equal protection claim under state or federal law. And, even if he had, it was MSUM's position that an equal protection claim under § 1983 claim would necessarily fail because Patil had no protected property interested in his probationary faculty position.

Patil acknowledged that he did not plead an equal protection violation, but stated that as an unrepresented party, he did not understand that such a claim had to be pled separately and made an oral request at the hearing "for the protection guaranteed by the constitution of the United States of America."

The IFO did not address Patil's reference to a state or federal equal protection violation.

## II.    STANDARD OF REVIEW

### A.    Motions To Dismiss Under Rule 12(b)(6)

In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true. Ashley County, Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009). In addition, "the court must resolve any ambiguities concerning the sufficiency of the plaintiffs' claims in favor of the plaintiffs, and give the plaintiffs the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint." Ossman v. Diana Corp., 825 F. Supp. 870, 880 (D. Minn. 1993) (internal quotation marks and citations omitted). At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Rule 8 of the Federal Rules of Civil Procedure and meet the principles articulated by the

United States Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, (2007) and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).

When considering a motion to dismiss, the Court "generally may not consider materials outside the pleadings," but "[i]t may ... consider some public records materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.'" <u>Noble Sys. Corp. v. Alorica Cent., LLC</u>, 543 F.3d 978, 982 (8th Cir.2008) (quoting <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir.1999)). Under Fed. R. Civ. P. 12(d), when "matters outside the pleadings are presented to and not excluded by the court" in connection with a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Here, the IFO submitted the Affidavit of Connie Howard, which attached a copy of Article 1, 5, 22, 24, 25 and 28 of the CBA. [Docket No. 31]. MSUM submitted the affidavit of Gary Cunningham, Esq., which attached Article 25, Section D of the CBA. [Docket No. 26]. The CBA is necessarily embraced by the pleadings and the Court may consider it without converting the motions to dismiss into motions for summary judgment. In addition, the CBA is a public document, readily available on the internet. This Court consulted the CBA in its entirety. <u>See</u> http://ifo.org/contractual-benefits/facultly/development.

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." This pleading requirement does not require detailed factual allegations. <u>Martin v. ReliaStar Life Ins. Co.</u>, 710 F. Supp. 2d 875, 886 (D. Minn. 2010) (citing <u>Twombly</u>, 550 U.S. at 555). On the other hand, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of

a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S., at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 677 (quoting Twombly, 550 U.S. at 556). "[T]he plausibility standard, which requires a federal court complaint to 'state a claim for relief that is plausible on its face, . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Ritchie v. St. Louis Jewish Light, 630 F.3d 713, 717 (8th Cir. 2011) (internal quotation and citation omitted). "Determining whether a complaint states a plausible claim for relief will, . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

In summary, the pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (internal quotation marks and citations omitted).

"Ordinarily dismissal of a [pleading] for failure to comply with Rule 8 should be with leave to amend." Michaelis v. Neb. State Bar Ass'n., 717 F.2d 437, 438-39 (8th Cir. 1983). Nonetheless, when a complaint is so deficient or defective that the court is convinced that its defects cannot be cured through re-pleading, dismissal with prejudice is appropriate. See McLean v. United States, 566 F.3d 391, 400 (4th Cir. 2009) ("to the extent . . . that a district court is truly unable to conceive of any set of facts under which

a plaintiff would be entitled to relief, the district court would err in designating [a] dismissal to be without prejudice. Courts, including this one, have held that when a complaint is incurable through amendment, dismissal is properly rendered with prejudice and without leave to amend."); McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc., 339 F.3d 1087, 1096 (9th Cir. 2003) (dismissal with prejudice is appropriate where "deficiencies in [plaintiff's] claims cannot be cured by amendment"); Cato v. United States, 70 F.3d 1103, 1106 (9th Cir. 1995) (a pro se litigant should be given chance to amend complaint unless it is "absolutely clear that the deficiencies of the complaint could not be cured by amendment."); Ikechi v. Verizon Wireless, Civ. No. 10-4554 (JNE/SER), 2011 WL 2118797 at *5, n.6 (D. Minn. April 7, 2011) (recommending dismissal with prejudice of plaintiff's fraud claims because it was unlikely that plaintiff could cure the defective pleading on re-pleading), 2011 WL 2118791 at *3 (D. Minn. May 25, 2011) (adopting the Report and Recommendation of Magistrate Judge Rau regarding dismissal of plaintiff's fraud claims for failure to satisfy the particularity requirement of Rule 9(b)).

### B.    Motion to Dismiss Under Rule 12(b)(1)

A motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) may challenge the plaintiff's complaint either on its face or on the factual truthfulness of its averments. See Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993); see also Osborn v. United States., 918 F.2d 724, 729 n. 6 (8th Cir. 1990). In a facial challenge to jurisdiction, the court restricts its review to the pleadings and affords the non-moving party the same protections that it would receive under a Rule 12(b)(6) motion to dismiss. See Osborn, 918 F.2d at 729 n. 6. The court presumes that all of

the factual allegations in the complaint concerning jurisdiction are true and will not dismiss the claims unless the plaintiff fails to allege an essential element for subject matter jurisdiction.  See Titus, 4 F.3d at 593 (citing Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 731-32 (11th Cir. 1982)); Osborn, 918 F.2d at 729 n.6.

In a factual challenge to jurisdiction, the court may consider matters outside the pleadings and the non-moving party does not benefit from the safeguards of 12(b)(6). See Titus, 4 F.3d 590 at 593; Osborn, 918 F.2d at 729 n.6.  "In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."  Osborn, 918 F.2d at 730 (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F. 2d 884, 891 (3rd Cir. 1977)).

Here, it appears that the IFO is making a facial challenge to the Complaint with respect to Patil's claims against it pursuant to 5 U.S.C. § 7114, 29 U.S.C. § 185 and 29 U.S.C. § 501.

### C. Entry of Default Judgment

"The entry of default judgment is not favored and should be a rare judicial act." Jones Truck Lines, Inc. v. Fosters Truck & Equip. Sales, Inc., 63 F.3d 685, 688 (8th Cir. 1995) (citation and quotation omitted).  Further, default judgments should not "be granted on the claim, without more, that the defendant had failed to meet a procedural time requirement."  Lacy v. Sitel Corp., 227 F.3d 290, 292 (5th Cir. 2000).

### D.    __Pro Se Complaints__

Pro se complaints, "however inartfully pleaded" are held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). "'[I]f the court can reasonably read the pleadings to state a valid claim on which the [plaintiff] could prevail, it should do so despite the [plaintiff's] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.'" Barnett v. Hargett, 174 F.3d 1128, 1133 (10th Cir.1999) (quoting Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir.1991)). But the court's liberal construction does not extend to allowing defective and insufficiently pled claims to proceed. Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004) (pro se complaint must allege facts sufficient to support the claims advanced); Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir.1985). ("[A]lthough it is to be liberally construed, a pro se complaint must contain specific facts supporting its conclusions."); Kaylor v. Fields, 661 F.2d 1177, 1183 (8th Cir.1981) ("[P]leadings . . . brought pro se [ ] are to be liberally construed. * * * But a well-pleaded complaint must contain something more than mere conclusory statements that are unsupported by specific facts.") (citations omitted). Neither may the courts, in granting the deference owed to pro se parties, "assume the role of advocate for the pro se litigant." Barnett, 174 F.3d 1133.

> When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework. That is quite different, however, from requiring the district court to assume facts that are not

> alleged, just because an additional factual allegation would
> have formed a stronger complaint.

Stone, 364 F.3d at 915. Consequently, a court "will not supply additional facts, nor will

[it] construct a legal theory for plaintiff that assumes facts that have not been pleaded."

Id. (quoting Dunn v. White, 880 F.2d 1188, 1197 (10th Cir.1989)).

With these standards in mind, the Court turns to the pending motions.

## III.   DISCUSSION

### A.   Default Judgment Against MSUM Should be Denied

According to Fed. R. Civ. P. 55(a), "[w]hen a party against whom a judgment for

affirmative relief is sought has failed to plead or otherwise defend as provided by these

rules, and the fact is made to appear by affidavit or otherwise, the clerk must enter the

party's default."   Johnson v. Dayton Elec. Mfg. Co., 140 F.3d 781, 783 (8th Cir. 1998)

("When a party 'has failed to plead or otherwise defend' against a pleading listed in Rule

7(a), entry of default under Rule 55(a) must precede [the] grant of a default judgment

under Rule 55(b).")

"When determining whether a Default Judgment is appropriate, the Court must

consider whether the allegedly defaulting party has filed a responsive Answer, or other

pleading."   Johnson v. Allied Interstate Inc., Civ. No. 02-910 (RJK/AJB), 2002 WL

1906024 at *2 (D. Minn., August 19, 2002) ("Although the entry of a default against

Allied would have been warranted as of the date Johnson brought her motion for default

judgment, no default was entered on the docket pursuant to Rule 55(a), and the Court

cannot ignore the fact that an Answer has now been filed and Allied is prepared to

defend the lawsuit on the merits.").

It was clear to this Court that Patil's Motion for Default Judgment was based on either a misunderstanding of MSUM's right to file a motion to dismiss in lieu of answering, or a misunderstanding of the time MSUM had to respond after being properly served. Pursuant to Rule 12(a)(1)(A), MSUM was required to serve a responsive pleading within 21 days of service. MSUM was not properly served until May 14, 2012, and timely served its motion to dismiss on May 31, 2012.[7] As a result, this Court recommends denying Patil's Motion for Default Judgment.

**B.** **The Complaint Fails to State any Federal Claims Against MSUM and the IFO**

As a preliminary matter, this Court notes that Patil did not respond to MSUM's motion to dismiss, and while he did respond to the IFO's motions, he did not address any of the IFO's legal arguments. Under normal circumstances Patil's failure to respond would invite a finding that Patil had waived his claims against the defendants. See Confluence Int'l, Inc. v. Holder, Civ. No. 08-2665 (DSD/JJG), 2009 WL 825793 at *3 (D. Minn. 2009) (finding that plaintiff had waived his due process claim by not pursuing it in his opposition memorandum) (citing Graham v. Rosemount, Inc., 40 F.Supp. 2d 1093, 1101 (D. Minn. 1999) (failure to respond to defendant's arguments resulted in waiver of claims)). But because Patil is unrepresented, the Court will presume that he did not understand the ramifications of his lack of response to MUSUM's motion or failure to

---

[7]    Even assuming that service was effected on May 3, 2012, when Patil served the administrative assistant at MSUM, this Court would not suggest taking the drastic step of recommending default judgment against MSUM on the basis of confusion over service dates.

respond to the IFO's legal arguments. Thus, for the benefit of the parties, the Court addresses the merits of both the IFO and MSUM motions to dismiss.[8]

This Court concludes that Patil's claims against the IFO and MSUM arising out of 18 U.S.C. §§ 1001 and 1512 fail because these are federal criminal statutes that do not provide a private right of action. "The touchstone for determining whether a statute confers a private right of action is congressional intent." Thompson v. Thompson, 484 U.S. 174, 179 (1988). "'[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" Id. (quoting Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 94 (1981)); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 286 (2002) ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.").

---

[8] The Court acknowledges that MSUM and the IFO moved to dismiss Patil's federal claims on different grounds. For example, the IFO moved to dismiss these claims on the grounds that the federal statutes on which Patil relied did not create a private right of action (18 U.S.C. §§1001, 1512), applied only to individual officers or employees (29 U.S.C. § 501(b)), applied only to private sector employers (29 U.S.C. §185, 29 U.S.C. § 501), or applied only to federal agencies, federal employees and the unions representing federal agencies (5 U.S.C. § 7114). IFO Mem., pp. 8-15. MSUM agreed that 18 U.S.C. §§1001 and 1512 did not provide for a private right of action, but focused its argument in favor of dismissal on its Eleventh Amendment immunity from suit and its position that the CBA grievance process was Patil's exclusive remedy. MSUM Mem., pp. 2-6. The Complaint does not distinguish between the IFO and MSUM when describing the federal statutes Patil alleged were violated—it merely listed the statutes. Complaint, p. 2. Although not argued by MSUM, the Court's analysis regarding the lack of application of the federal statutes applies equally to MSUM as it does to the IFO, as the Court "has the power to sua sponte dismiss a complaint for failure to state a claim." Smith v. Boyd, 945 F.2d 1041, 1043 (8th Cir. 1991). Therefore, the Court will address these statutes as they related to MSUM as well as the IFO.

Here, nothing in the text of these statutes indicates that Congress intended to create a private right of action.

Furthermore, federal courts have rejected the argument that either statute creates a private right of action. See Rowland v. Prudential Fin., Inc., 362 Fed. Appx. 596, 596 (9th Cir. 2010) (no private right of action under 18 U.S.C. § 1512); Andrews v. Heaton, 483 F.3d 1070, 1076 (10th Cir. 2007) (upholding district court's dismissal of plaintiff's action under 18 U.S.C § 1001 (among other sections) because "these are criminal statutes that do not provide for a private right of action and are thus not enforceable through a civil action."); Kennedy v. Fresenious Med. Care N. Amer., Civ. No. 11-3738, 2012 WL 4378165 at *3 (D. Md., 2012) ("The statutes [plaintiff] has cited are criminal, not civil, and therefore confer no private cause of action on individual litigants. See, e.g., Peavey v. Holder, 657 F. Supp.2d 180, 190–91 (D. D.C. 2009), aff'd, 09–5389, 2010 WL 3155823 (D.C. Cir. Aug. 9, 2010) (no private cause of action under 18 U.S.C. §§ 1505, 1512; Feldman v. Law Enforcement Associates Corp., 779 F.Supp. 2d 472, 498 (E.D.N.C. 2011) (no private cause of action under 18 U.S.C. §§ 1512, 1513). Individual litigants, like [plaintiff], cannot initiate federal criminal prosecution based on their allegations of unlawful conduct.")); Rundgren v. Bank of New York Mellon, 777 F. Supp.2d 1224, 1233 (D. Hawai'i 2011) ("[1]8 U.S.C. § 1001 is a criminal statute and does not provide for a private cause of action. See, e.g. AirTrans, Inc. v. Mead, 389 F.3d 594, 598 n. 1 (6th Cir. 2004) (finding no private cause of action for violation of 18 U.S.C. § 1001); Fuller v. Unknown Officials from the Justice Dept. Crime Div., 387 Fed. Appx. 3, 4 (D.C. Cir. 2010) (same); Horne v. Social Sec. Admin., 359 Fed. Appx. 138, 141 (11th Cir. 2010) (same); Ng v. HSBC Mortg. Corp., 2010 WL

889256, at *9 (E.D.N.Y. Mar. 10, 2010) (collecting cases explaining that 18 U.S.C. § 1001 does not create a private cause of action); <u>Anderson v. Wiggins</u>, 460 F. Supp.2d 1, 8 (D.D.C. 2006) ("Private causes of action are also precluded for the criminal statutes located at 18 U.S.C. § 1001")).

As a result, Patil's claims under these statutes should be dismissed with prejudice.

Patil's claims under 29 U.S.C §501(b) of the LMRDA fail because the plain language of the statute provides for a cause of action against "any officer, agent, shop steward or representative of any labor organization."[9]  The statute, therefore, permits claims against individuals, not claims against organizations, such as Patil has brought against the IFO.  Patil has not alleged any wrongdoing by any individual in connection with the IFO's decision not to file a grievance on Patil's behalf.  <u>See</u> Complaint. Furthermore, as the IFO has pointed out, even if Patil had a cause of action against an individual (which he did not plead), he failed to comply with the procedural requirements of the statute, which require him to seek leave of the court before initiating such a suit. For these reasons, Patil's claims under 29 U.S.C §501 (b) fail and should be dismissed with prejudice.

Patil's claims under 29 U.S.C § 185 (a), (b) and (c) fail because that statute applies only to employers, employees and labor organizations in the private sector.  <u>See</u> 29 U.S.C. § 152 (2) (defining "employer" to exclude "any State or political subdivision thereof. . . .").  "Where a governmental employer is involved, federal jurisdiction over such a suit does not exist."  <u>City of Sagninaw v. Service Employees Intern. Union, Local</u>

---

[9]     By its very wording, the statute cannot apply to MSUM.

446-M, 720 F.2d 459, 462 (6th Cir. 1983) (citing Ayres v. International Bhd. of Elec. Workers, 666 F.2d 441, 444 (9th Cir.1982); Crilly v. Southeastern Pa. Transp. Auth., 529 F.2d 1355 (3d Cir.1976)).  Patil did not challenge the defendants' representations that MSUM is a political subdivision of the State of Minnesota and Patil's Complaint did not (and could not) allege that these defendants were "private sector" employers within the meaning of 29 U.S.C § 185(a)(b) and (c).

Patil's claims under Title VII of the Civil Service Reform Act of 1978, 5 U.S.C § 7114 fail because the Act applies only to federal employees.  See 5 U.S.C § 7101 (b) ("It is the purpose of this Chapter to prescribe certain rights and obligations of the employees of the Federal Government and to establish procedures which are designed to meet the special requirements and needs of the government.  The provisions of this chapter should be interpreted in a manner consistent with the requirement of an effective and efficient Government."); see also Karahalios v. National Fed'n of Fed. Employees, 489 U.S. 527, 531-532 (1989) (describing the history of Title VII of the Civil Service Reform Act of 1978 in the context of federal employment); Veterans Admin. Med. Ctr., Minneapolis, Minn. v. Federal Labor Relations Auth., 705 F.2d 953, 957 (8th Cir. 1983) ("The purpose of Title VII of the Civil Service Reform Act of 1978 was. . .to lay the foundation for open and mutually beneficial labor-management relations throughout the federal sector.").  None of the provisions of § 7114 on which Patil has relied can apply to his employment with MSUM, which is a state, not a federal employer. Therefore, those claims should be dismissed with prejudice.

For all of these reasons, this Court recommends that all of Patil's federal claims against the IFO and MSUM be dismissed with prejudice.

## C.    Supplemental Jurisdiction Over State Claims

Having concluded that Patil's federal claims against the IFO and MSUM should be dismissed with prejudice, the Court must decide whether it is appropriate to exercise supplemental jurisdiction over Patil's state law claims against MSUM for breach of contract and against the IFO for breach of contract, breach of fiduciary duty and breach of the duty of fair representation.  See 28 U.S.C. § 1367(a) ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related [to the federal claims]. . . that they form part of the same case or controversy"); Lindsey v. Dillards, 306 F.3d 596, 599 (8th Cir. 2002) (the district court is not required to remand state law claims when the federal claims have been dismissed.  "Instead, the district court maintains discretion to either remand the state law claims or keep them in federal court.").

When determining whether to exercise supplemental jurisdiction, a federal court should "[b]alanc[e] factors such as judicial economy, convenience, fairness and comity." Quinn v. Ocwen Fed. Bank FSB, 470 F.3d 1240, 1249 (8th Cir. 2006).  The doctrine of pendent jurisdiction is "designed to allow a court to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." Carnegie-Mellon v. Cohill, 484 U.S. 343, 350 (1988).  The Court acknowledges that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine. . . will point toward declining jurisdiction over the remaining state law claims." Id., p. 350, n.7. Nonetheless, where, as here, the Court can address the state law claims without reference to novel or unresolved issues of state law, which are best left to the state

courts, and where the claims do not invoke issues of state policy, this Court had determined that the balance of factors weighs on the side of retaining jurisdiction over Patil's state law claims. See Valencia ex. Rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (addressing additional factors a court may consider in deciding whether to exercise supplemental jurisdiction).

### 1. Patil's State Law Claims Against MSUM

The Eleventh Amendment states that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." The United States Supreme Court has construed the Eleventh Amendment, which by its plain language applies to actions against states by citizens of other states, to also bar suits in federal court against a state by its own citizens. Edelman v. Jordan, 451 U.S. 651, 662-63 (1974).

Under the Eleventh Amendment, federal courts lack subject matter jurisdiction over a claim against a state for damages when that state has not consented to the suit. See Kimmel v. Florida Bd. Of Regents, 528 U.S. 62, 72 (2000); Seminole Tribe of Fla. V. Florida, 517 U.S. 44, 64–65 (1996). When a lawsuit is barred by the Eleventh Amendment, the case must be dismissed for lack of subject matter jurisdiction. Seminole Tribe, 517 U.S. at 64–65. This immunity extends to state agencies. Florida Dept. of Health & Rehabilitative Servs. V. Florida Nursing Home Assn., 450 U.S. 147, 150 (1981). "[I]n the absence of consent a suit in which the state or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100-01 (1984). Further, this

prohibition applies regardless of the relief sought. Id. ("This jurisdictional bar applies regardless of the nature of the relief sought.") (citing Missouri v. Fiske, 290 U.S. 18, 27 (1933) ("Expressly applying to suits in equity as well as at law, the [Eleventh] Amendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a State.")[10]

"This constitutional bars applies with equal force to pendent state law claims." Cooper v. St. Cloud State Univ., 226 F.3d 964, 968 (8th Cir. 2000) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 120-121 (1984). In Cooper, the Eighth Circuit considered an appeal by a former faculty member who was denied tenure by St. Cloud State University ("SCSU"). The district court granted SCSU's motion for summary judgment, based in part on its Eleventh Amendment immunity from suit because it was a state agency. 226 F.3d at 966. The Eighth Circuit noted that the test for determining whether a state has waived its immunity "is a stringent one." Id. At 969

---

[10] The United States Supreme Court has long recognized an exception to Eleventh Amendment immunity permitting suits in federal court against state officials alleged to have violated federal law, where the relief sought is for prospective injunctive or declaratory relief from the state officer acting in his or her official capacity. See Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 645-46 (2002) (construing the Ex Parte Young, 209 U.S. 123 (1908)). "'Ex parte Young recognized that suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law.'" Trelevan v. University of Minn., 73 F.3d 816, 819 (8th Cir. 1996) (quoting Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 255 (8th Cir. 1995)). "The exception to the Eleventh Amendment carved out by Ex Parte Young and its progeny does not extend to lawsuits seeking to enjoin state officials from violating state law." Id., n.4. The court in Trelevan recognized the University of Minnesota's Eleventh Amendment immunity, but reversed the district court's grant of summary judgment in favor of one of the individual defendants, Dean David S. Kidwell. Id., p. 819. The court noted that the plaintiff was seeking prospective injunctive relief from Dean Kidwell in the form of reinstatement of his position as a tenure-track faculty member. Such suits are not barred by the Eleventh Amendment. Id.

(citation omitted). Any waiver must be clear and unequivocal and it must expressly relate to consent to suit in federal court. Id. (citations omitted). In the absence of an explicit waiver of immunity, the appellate court affirmed the district court's grant of summary judgment in favor of SCSU. Id.

MSUM and the IFO have alleged, and Patil has not contested, that MSUM is a political subdivision of the State of Minnesota. MSUM Mem., pp. 2-3 (describing MSUM as "a part" of the state), IFO Mem., pp. 15-16 (describing MSUM as a "subdivision" of the state). There is no argument or evidence that MSUM has waived its immunity to suit in federal court or that its immunity has been abrogated by an act of the legislature. Therefore, Patil's state common law breach of contract claim seeking injunctive relief against MSUM must be dismissed on the basis of MSUM's Eleventh Amendment immunity.

Even assuming that MSUM did not have Eleventh Amendment immunity, the CBA governing Patil's employment describes Patil's exclusive remedy for MSUM's decision not to renew his teaching appointment.

Article 28 of the CBA describes the mandatory grievance and arbitration process.[11] Howard Aff., Ex. 1, pp. 108-111. The first step of the formal grievance process requires the grievant, within thirty days of the date of the act or omission giving rise to the grievance or the date on which the grievant should have known of such act or omission, to complete and forward to the Academic Vice President a signed, written

---

[11] Article 25, Section D, subdivision 4 of the CBA provides: "The probationary faculty member who is non-renewed shall have access to the full grievance procedure for any violation of Subds. 2 and 3 above [describing the notice that must be given to the faculty member and the faculty member's right to meet with the President] and shall have access through the President's level of the grievance process for any other violation of this section."

grievance form (included as Appendix A to the CBA).  Id., pp. 108-109.  If the grievant, the grievant's exclusive representative or the Academic Vice President requests a meeting, the parties have seven days from the date the Vice President receives the grievance to arrange a meeting.  Id., p. 109.  If the parties cannot resolve their dispute in the meeting, then the Vice President has ten days form the date of the meeting to respond to the grievance.  Id.  If no meeting takes place, the Vice President has ten days from the date of receipt of the grievance to respond.  Id.

At step two of the process, the grievant or the grievant's exclusive representative may present the grievance to the President within ten days of receipt of the Step I response.  As in Step I, if either of the parties requests a meeting, the meeting must be held within seven days of receiving the grievance. Id.  Thereafter, the President has ten days to issue his response.  Id.  If no meeting is requested, the President has ten days to issue a response to the grievance.  Id.  If the grievance is not resolved, at step three of the process, the grievance is referred by the IFO to the Chancellor.  If no settlement is reached as a result of a meeting between the IFO representative and the Chancellor, the Chancellor must provide the IFO with a written response within ten days of the meeting.  Id.

At step four of the process, the exclusive representative[12] may request arbitration.  Id.  The arbitrator's decision is final and binding on all parties.  If the decision to not renew the appointment of a probationary faculty member is grieved and appealed to arbitration, "the arbitrator is limited to determining whether the President's decision was arbitrary or capricious or was procedurally flawed." Id., p. 103.

---

[12]    The "exclusive representative" is the IFO.  Howard Aff., Ex. 1, p. 19 (CBA, "Definitions").

Although the CBA does not explicitly state that the grievance and arbitration process is the aggrieved faculty member's "exclusive remedy," neither does it provide for an "opt out" of the process or its culminating step, arbitration (i.e. permit the aggrieved faculty member to sue rather than arbitrate). Therefore, this Court concludes that the grievance and arbitration procedure set forth in the CBA is the only recourse for a faculty member to challenge MSUM's decisions regarding renewal of a teaching appointment. Under these circumstances, where MSUM's decision regarding Patil's faculty appointment is clearly within the scope of the CBA, Patil cannot sue MSUM in state court for breach of contract. See White v. Winona State Univ., 474 N.W.2d 410, 412 (Minn. Ct. App. 1991).

In White, Winona State University hired White as a faculty member and chair of the University's biology department. Id. At 411. White's employment was governed by a CBA between Winona State and the IFO. Id. After White was removed as department chair by the Academic Vice-President, he sued Winona State for breach of contract. Id. The trial court determined that White's breach of contract action was non-justiciable because the CBA provided the only method of dispute resolution. Id. The Minnesota Court of Appeals upheld that finding, noting:

> The widely-accepted rule in both Minnesota and federal courts is that, if a grievance procedure within a collective bargaining agreement is intended to be the exclusive remedy for an employee's claims, employees cannot bring actions in state or federal court for breach of contract. See Bowen v. United States Postal Serv., 459 U.S. 212, 225 n. 14. . . (1983) (collective bargaining agreement may provide that grievance procedure is exclusive remedy for addressing employee's claims). . . .

Id. At 412. The CBA at issue explicitly denied chairpersons who have been removed from their positions access to a grievance process. Id. At 412. As a result, the court concluded that "by prohibiting or limiting resort to the grievance procedure, the parties foreclosed all contractual remedies for termination of chairperson appointment." Id. In other words, the lack of access to a grievance process closed, rather than opened, the door to litigation . Id.

White reflects the primacy of a CBA in determining the rights of an aggrieved employee. Id. (citing McIntire v. State, 458 N.W.2d 714, 720 (Minn. Ct. App. 1990) (CBA that denied any remedy for grievance beyond a meeting with the employer provided exclusive remedy for grievance and precluded a breach of contract action), cert. denied 498 U.S. 1090 (1991). See also Moen v. Sunstone Hotel Prop., 818 N.W.2d 573, 578 (Minn. Ct. App. 2012) (rejecting employee's argument that a CBA must explicitly preclude judicial action for an arbitration clause to be exclusive); (Wallin v. Minnesota Dept. of Corrs., 598 N.W.2d 393, 404 (Minn. Ct. App. 1999), review denied (Oct. 21, 1999) (state court lacks jurisdiction to hear breach of contract claim where the parties' employment relationship is governed by a CBA and the issues presented fall within the scope of the grievance process set forth in the CBA).

This Court concludes that Patil's exclusive remedy for MSUM'S decision not to renew his appointment was set forth in the governing CBA and, therefore, his breach of contract claim against MSUM cannot survive in a suit in federal court. This Court recommends dismissal of that claim against MSUM with prejudice.

### 2. Patil's State Law Claims Against the IFO

The IFO moved to dismiss Patil's claims on the ground that they were time barred under the operable 90-day statute of limitations described in <u>Allen</u>, 680 N.W.2d at 563. IFO Mem., pp. 16-19.

The Minnesota Supreme Court in <u>Allen</u> stated:

> A discharged employee whose union decides not to take his or her grievance to arbitration may sue both the union for breach of the duty of fair representation (DFR) and the employer for breach of the labor contract. <u>See Lipka v. Minn. Sch. Employees Ass'n, Local 1980</u>, 550 N.W.2d 618, 621 n. 7 (Minn.1996). In these so-called hybrid claims, the employee must plead and prove the case against the union in order to succeed against the employer. <u>Paoletti v. Northwestern Bell Telephone Co.</u>, 370 N.W.2d 672, 675 (Minn.App.1985), review denied (Minn. 26 Sept. 1989).

<u>Id.</u> at 563. The court went on to conclude that "hybrid" claims involving breach of the duty of fair representation (against the union) and breach of contract (against the employer) are governed by a 90-day limitations period. <u>Id.</u> at 563-565. Although the plaintiff had argued that fact issues precluded dismissing his claim on statute of limitations grounds, the court found that the 90-day period began to run when the employee received a letter stating that his union would not pursue a grievance on his behalf. <u>Id.</u> at 566. Because plaintiff failed to start his suit within 90 days of that date, his claims were properly dismissed as time-barred. <u>Id.</u> at 566-567.

As in <u>Allen</u>, the CBA at issue here is governed by Minnesota's Public Employment Relations Act, Minn. Stat. §§ 179A.01-.30.[13]

---

[13]     Article 3, Section A of the CBA states:

> Recognition. Pursuant to the Minnesota Public Employment Labor Relations Act of 1971, as amended, the Employer recognizes the Association as the exclusive representative in

This Court finds that the 90-day limitation period described in <u>Allen</u> applies to Patil's "hybrid" claims. As argued by the IFO, the time within which Patil was required to sue the IFO was no later than March 15, 2012 (<u>see</u> n.5, p. 14, <u>supra.</u>), but he did not commence his suit against the IFO until April 27, 2012. As a result, the statute of limitations bars all of Patil's state law claims against the IFO and they should be dismissed with prejudice

### D. Patil's Oral Request to Plead Constitutional Claims

In response to MSUM and the IFO's oral arguments in favor of dismissal at the hearing, Patil referenced Article 1, Section 2 of the Minnesota Constitution, "equal protection," and the "protection guaranteed by the constitution of the United States of America." At best as this Court can discern, it appeared that Patil was invoking state and federal equal protection provisions to challenge MSUM's decision to not renew his teaching appointment. And, as Patil also referenced the "lies" that individuals from both the IFO and MSUM allegedly told the EEOC investigator, perhaps he was also seeking permission to assert similar claims against the IFO.

Giving Patil the benefit of the doubt, the Court will construe his comments at oral argument as a request for permission to add equal protection claims against MSUM and

---

the appropriate unit as described in the decisions of the Bureau of Mediation Services in the cases 72- PR-180-A, 73-PR-414-A, and 73-PR-431-A dated January 24, 1975; and the Bureau of Mediation decision in cases 72-PR-180-A, 73-PR-414-A and 73-PR-431-A dated April 24, 1975, case 80-PR- 1305-A dated June 30, 1980; and case 83-PR-1218-A dated September 9, 1983.

the IFO under Article 1, Section 2 of the Minnesota Constitution and the Fourteenth Amendment to the U.S. Constitution.[14]

If Patil intended to assert an equal protection claim against MSUM under the Minnesota Constitution or the Fourteenth Amendment based on 42 U.S.C. § 1983, these claims are futile as they are barred based on the Eleventh Amendment. McIntire v. State, 458 N.W.2d 714, 717, n.2 (Minn. 1990) (Eleventh Amendment bars § 1983 claims against a state and its departments) (citing Will v. Michigan Dept. of State Police, 491 U.S. 58, 67-71 (1989)). "The State of Minnesota has [not] waived its Eleventh Amendment immunity with respect to . . .§ 1983 claims. Additionally, in enacting §§ 1981 and 1983, Congress did not make a clear statement of intent to abrogate states' Eleventh Amendment immunity." Smith v. Fabian, Civ. No. 10-2193 (JRT/TNL), 2012 WL 1004982 at *3 (D. Minn. Mar. 26, 2012) (citation and quotation omitted).

Likewise, any request for leave to amend the Complaint to allege a cause of action against the IFO based on Minnesota Constitution or the Fourteenth Amendment, is denied because neither Article 1, Section 2 of the Minnesota Constitution nor the Fourteenth Amendment apply to private actors.[15] See State v. Morrow, 492 N.W.2d

---

[14]  The Minnesota Supreme Court has concluded that "'[b]oth clauses [the Equal Protection clause of the Fourteenth Amendment and Article 1, Section 2 of the Minnesota Constitution] have been analyzed under the same principles.'" In re Welfare of M.L.M., 813 N.W.2d 26, 37 (Minn. 2012) (quoting Kolton v. Cnty. of Anoka, 645 N.W.2d 403, 411 (Minn.2002)). "Specifically, the 'Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike.' Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); see also Behl, 564 N.W.2d at 568 (stating that equal protection "does not require the state to treat things that are different in fact or opinion as though they were the same in law")." Id.

[15]  Likewise, Patil cannot state a federal equal protection claim under § 1983, as he would have to allege that the IFO deprived him of a federal right while acting under the

539, 548-549 (Minn. Ct. App. 1992) (state action is a prerequisite for an equal protection claim under the Fourteenth Amendment or the equal protection clause of the Minnesota Constitution).

As a general rule, "[t]he Fourteenth Amendment protects liberty and property rights against state action, but offers no protection against private conduct." In re Molnar, 720 N.W.2d 604, 611 (Minn. Ct. App., 2006) (citing Blum v. Yaretsky, 457 U.S. 991, 1002 (1982); Shelley v. Kraemer, 334 U.S. 1, 13, (1948) (stating that the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful"); Coller v. Guardian Angels Roman Catholic Church, 294 N.W.2d 712, 716-17 (Minn.1980) (holding that private-school teacher who directed state-sponsored program had no due process claim in absence of state action)). On the other hand, "[p]rivate conduct may be subject to governmental constraints when it is regulated by the state and 'there is a sufficiently close nexus between the [s]tate and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the [s]tate itself.'" Id., (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351(1974)).[16]

---

color of state law. Gomez v. Toledo, 446 U.S. 635, 640 (1980). The IFO is not a state actor.

[16]   In Molnar, the court also discussed the situation where there could be a state action between a private entity and state agency because they have a "symbiotic relationship,"  described as follows:

> A symbiotic relationship between a private entity and the state exists when the state has "so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961). In analyzing whether a symbiotic relationship existed between a state agency and a private entity,

Here, whatever it is that Patil may be claiming against the IFO in connection with an equal protection claim (and this Court will not attempt to guess at what such a claim could be), that claim cannot be said to be inextricably intertwined with the actions of the MSUM to terminate his employment. Therefore, Patil's oral request to amend his Complaint to add an equal protection claim against the IFO is denied.

### E. Conclusion

None of Patil's current federal claims against MSUM and the IFO state a cause of action. As for Patil's state claim of breach of contract against MSUM, the Eleventh Amendment and the CBA preclude his attempt to pursue the MSUM in court, whether federal court or state court. Patil's state claims against IFO of breach of fiduciary responsibility, breach of contract and breach of the duty of fair representation must be dismissed as they were not timely brought. Finally, any attempt to add equal protection claims against MSUM and IFO based on the Minnesota Constitution or the Fourteenth Amendment is denied because these claims are futile. For all of these reasons, this Court concludes that Patil's suit must be dismissed with prejudice.

---

we consider whether the private entity benefits directly from state action, whether the state agency, in turn, benefits from the private entity's conduct, and whether the state agency was complicit in the objectionable policy based on its failure to intervene. Id. at 723-25, 81 S.Ct. at 861. Thus, when the state elects to "place its power, property and prestige behind" a private entity's action, the action "cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." Id. at 725, 81 S.Ct. at 862.

720 N.W.2d at 613.

This Court can conceive of no facts under which it conclude that the IFO, which is charged with protecting the rights of its member employees, could be said to be in a symbiotic relationship with MSUM.

## IV.    RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.    Defendant Inter Faculty Organization's Motion to Dismiss Under Rule 12(b)(6) for Failure to State a Claim [Docket No. 5] and Motion to Dismiss [Docket No. 28] be GRANTED.    Plaintiff's claims against the IFO should be dismissed with prejudice.

2.    Defendant MSUM University's Motion to Dismiss Complaint [Docket No. 16] be GRANTED.    Plaintiff's claims against MSUM should be dismissed with prejudice.

3.    Plaintiff's Motion for Default Judgment as to MSUM University [Docket No. 19] be DENIED.

Dated: December 10, 2012                 *Janie S. Mayeron*
                                         JANIE S. MAYERON
                                         United States Magistrate Judge


## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 26, 2012**, a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections.    A party may respond to the objecting party's brief within 14 days after service thereof.    All briefs filed under this Rule shall be limited to 3500 words.    A judge shall make a de novo determination of those portions to which objection is made.    This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.